**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF VERMONT**

Filed & Entered
On Docket
June 1, 2015

_____

**In re:**
    **Gregory A. Ladieu,**　　　　　　　　　　　　　　　　　　　　　　Chapter 13 Case
             **Debtor.**　　　　　　　　　　　　　　　　　　　　　　　　　# 14-10551
_____

*Appearances*:　W. Scott Fewell, Esq.　　　　　　　　　　　　David W. Lynch, Esq.
　　　　　　　　Dinse Knapp & McAndrew PC　　　　　　　　David W. Lynch PC
　　　　　　　　Burlington, VT　　　　　　　　　　　　　　　Colchester, VT
　　　　　　　　Attorney for Creditor　　　　　　　　　　　　Attorney for Debtor

**MEMORANDUM OF DECISION**
**DENYING CREDITOR'S MOTION TO DISMISS**
**AND OVERRULING CREDITOR'S OBJECTION TO CONFIRMATION**

      Creditor Rentrak Corporation seeks a determination that the Debtor, Gregory A. Ladieu, has acted in bad faith and, based upon that determination, requests the Court enter an order either dismissing this bankruptcy case or denying confirmation of Mr. Ladieu's Chapter 13 plan. Alternatively, Rentrak Corporation seeks an order denying confirmation of the Debtor's Chapter 13 plan based upon the plan's lack of feasibility. For the reasons set forth below, the Court finds Rentrak Corporation has failed to present evidence warranting a finding that either the Debtor acted in bad faith or the plan is not feasible, and therefore, the Court denies Rentrak Corporation's motion to dismiss the case and overrules Rentrak Corporation's objections to confirmation of the Debtor's Chapter 13 plan.

**JURISDICTION**

      The Court has jurisdiction over this contested matter pursuant to 28 U.S.C. §§ 157 and 1334, and the Amended Order of Reference entered by Chief Judge Christina Reiss on June 22, 2012.

      The Court declares that this contested matter is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (L), and that this Court has constitutional authority to enter a final judgment in this contested matter.

**PROCEDURAL HISTORY**

      Prior to filing the instant case, Gregory A. Ladieu (the Debtor) filed a petition for relief under Chapter 7 of the Bankruptcy Code (doc. # 1 in case # 07-10868, filed December 27, 2007). Creditor

1

Rentrak Corporation (hereafter "Rentrak") filed a complaint initiating an adversary proceeding in that case on June 2, 2008 (doc. # 15 in case # 07-10868), seeking a determination the debt the Debtor owed to Rentrak was excepted from discharge under 11 U.S.C. §§ 523(a)(4) and (6).[1] Ultimately, Rentrak succeeded; the Court entered an order with memorandum of decision on November 4, 2011, declaring Rentrak's debt was excepted from discharge under § 523(a)(6) (doc. ## 109, 110 in adversary proceeding # 08-1010). Thereafter, the Debtor received a discharge of all debts eligible to be discharged, and the Chapter 7 case was closed on June 8, 2012 (doc. ## 46, 49 in case # 07-10868).

On October 9, 2014, the Debtor filed a petition for relief under Chapter 13 of the Bankruptcy Code, as well as a proposed Chapter 13 plan (doc. ## 1, 2 in case # 14-10551) (the "Plan").[2] On January 7, 2015, Rentrak filed a motion to dismiss the case as well as an objection to confirmation of the Plan (doc. ## 25, 26). The Debtor filed a joint response to Rentrak's motion to dismiss and objection to confirmation (doc. # 32), and shortly thereafter filed an amended Chapter 13 plan, amended Schedules I and J (doc. ## 37, 38, 41), and an amended "Means Test" Form 22C (doc. 46).

On January 28, 2015, Rentrak filed an objection to confirmation of the Debtor's amended Chapter 13 plan, and renewed its motion to dismiss (doc. ## 47, 48). The following week, the parties filed a pre-trial statement, to which the Debtor filed a supplement (doc. ## 50, 51).[3] At the same time, the Debtor filed an objection to certain evidence and one witness proposed by Rentrak (doc. # 52). Rentrak filed a response to the Debtor's objection (doc. # 56). The Court entered an Order sustaining the Debtor's objection with respect to Rentrak's proposed witness and overruling the Debtor's objection in all other respects (doc. # 57). On February 10, 2015, the Debtor filed amended Schedules B and C.

The Court conducted a one-day trial on February 11, 2015, at which the Debtor was the only witness. Based on the parties' representations at that trial, the Court entered a Scheduling Order on February 18, 2015 to resolve some minor remaining discovery issues. The Scheduling Order provided the parties an opportunity to file supplemental memoranda of law and appear at a subsequent hearing, for the sole purpose of addressing issues on which any newly produced evidence would have a material impact. Neither party filed a supplemental memorandum and, on March 12, 2015, the parties informed the Court they had no further issues to bring to the Court's attention. Accordingly, the matter was fully submitted as of that date.[4]

---

[1] All statutory citations refer to Title 11 United States Code (the "Bankruptcy Code"), unless otherwise indicated.
[2] All subsequent citations to the docket refer to case # 14-10551 unless otherwise noted.
[3] The pre-trial statement was subsequently redacted and re-filed at doc. # 63.
[4] Thereafter, on March 11, 2015, Rentrak filed a motion to substitute Vobile, Inc. ("Vobile") in its stead, pursuant to Federal Rule of Civil Procedure 25(c) (doc. # 69), which the Court granted on March 17, 2015 (doc. # 71). For purposes of clarity, although by way of that substitution the party seeking relief is now Vobile, the Court refers to Rentrak throughout the decision, as it was the active party in this litigation through the date of full submission.

2

The Chapter 13 trustee opposes Rentrak's motion to dismiss the case and Rentrak's objections to confirmation. The trustee supports confirmation of the amended plan (doc. # 37), as is evidenced by the preliminary report he filed on November 14, 2014, and the statements he made at the February 11, 2015 trial.

## UNDISPUTED MATERIAL FACTS

The Court finds the following facts to be undisputed and pertinent to the Court's analysis of the legal issues presented.

1. The Debtor filed a petition for relief under Chapter 13 on October 9, 2014 (the "Original Petition"). Doc. # 1.

2. The sole noteworthy personal property identified on Schedule B of the Debtor's Original Petition are a checking account owned jointly with the Debtor's non-filing spouse containing $4,600, and a 2012 Hyundai Sonata in which the Debtor has no equity.

3. The Original Petition identifies a debt to Rentrak in the amount of $51,944.46.[5]

4. Schedule I of the Original Petition ("Original Schedule I") lists the Debtor's household income as $6,406.99, including $2,274.99 from the Debtor's employment as a security guard.

5. Original Schedule I also includes $4,132 attributable to the Debtor's spouse, which is included on line 8a as "Net income from rental property and from operating a business, profession, or farm."

6. Original Schedule I includes a breakdown of the Debtor's spouse's business income and expenses showing $6,519 of gross monthly income and $2,387 of expenses for inventory purchases, resulting in net income from her self-employment of $4,132.

7. On the line item of Original Schedule I which asks whether the Debtor expects an increase or decrease [of income] within the year after he files this form, the Debtor checked the box labeled "No."

8. Schedule J of the Original Petition ("Original Schedule J") lists four dependents of the Debtor, the Debtor's children, ages 12, 10, 7, and 5.

9. Original Schedule J lists the Debtor's household expenses as $6,128.02, resulting in a monthly net income, i.e., the amount available for monthly payments under a Chapter 13 plan, of $278.97.

10. Of those expenses relevant to the instant dispute, the Original Schedule J lists the Debtor's monthly mortgage payment as $998; monthly real estate taxes as $223.41; monthly electricity, heat, and natural gas utility expenses as $616.20; and "other" monthly expenses as $750.

---

[5] Originally, Rentrak was listed as a secured creditor. However, the Debtor subsequently filed a motion to avoid lien (doc. # 14), which the Court granted on January 20, 2015 (doc. # 34). Accordingly, the Court treats Rentrak's debt as wholly unsecured for purposes of this case and the instant contested matter.

11. Original Schedule J includes a continuation sheet breaking out the $750 "other" monthly expenses as comprised of $50 for pet food and $706 for monthly payments on Debtor's spouse's unsecured debts.[6]

12. On the line of Original Schedule J which asks whether the Debtor expects an increase or decrease in his expenses within the year after he files this form, the Debtor checked the box labeled "Yes."

13. In the box provided for an explanation, the Debtor stated

> The budget includes household income and expenses for Debtor and [the Debtor's spouse]. Available income may change in the next several months depending on [the Debtor's spouse's] student loan obligation and Debtor's obligation to purchase health insurance from his new employer. The budget included [the Debtor's spouse's] payment for auto loan on which Debtor is not contractually obliged.

14. The "Means Test" Form 22C filed contemporaneously with the Original Petition indicates the Debtor's disposable income is not determined under §1325(b)(3) – i.e., the Debtor's household income under the Means Test is below the median income for a comparable Vermont household.

15. The Debtor's first Chapter 13 plan, filed contemporaneously with the Original Petition, proposed to pay the Chapter 13 Trustee a total of $10,042.92, representing equal payments of $278.97 per month for thirty-six months.

16. The Debtor's first Chapter 13 plan anticipated payments to general unsecured creditors totaling $6,538.52 for a dividend of 9.74%.

17. The Debtor filed amended Schedules I and J, with an addendum, on January 21, 2015, approximately three months after he filed the Original Petition and Schedules and two weeks after Rentrak filed its motion to dismiss and objection to confirmation.

18. The amended Schedule I revises the Debtor's income from employment from $2,274.99 to $2,202.74. This figure reflects changes to both the Debtor's gross income and his payroll deductions.

19. The amended Schedule I does not revise the Debtor's spouse's income.

20. As a result of the revision of the Debtor's income, the Debtor's household income decreased by approximately $70, from $6,406.99 to $6,334.74.

21. On the line of amended Schedule I which asks whether the Debtor expects an increase or decrease [of income] within the year after he files this form, the Debtor checked the box labeled "Yes."

22. The Debtor included the following explanation to correspond to that answer:

> The amended [schedules] I and J change Debtor's income to reflect his earnings as of 12/24/14 and it is expected that an amount close to this rate of pay will continue indefinitely.

---

[6] The figures in the continuation sheet appear to contain an error as they total more than the $750 shown on Original Schedule J.

4

Debtor had unexpected overtime income for paychecks between October 16 and December 24, five checks representing ten weeks of employment. The average monthly additional income for this time frame is $350, and that amount time 2.5 months is $857 which will be paid into the plan by extending the plan an additional 3 months after month 36.

[The Debtor's] spouse's income available to the household is changing as she had a substitute teaching position in late November and early December, 2014 and has a new substitute teaching position beginning January 5, 2015 for five months. The rate of pay is about $4,000 per month. This income was not anticipated at the date of filing the petition. There has been and will continue to be reductions in income from self employment as [the Debtor's] spouse is working at school [and] she does not have time for promoting sales. It is expected self employment income will continue to decline at about $1,000 per month and may level off at $1,000. [The Debtor's] spouse will be unemployed for three months this summer and expects the extra income earned now will carry the family through the summer into the fall when she hopes to resume teaching. It is difficult to project [the Debtor's] spouse's average monthly income over the next ten months, but best estimates at this time are that the income will average the household a sum that is close to the income listed here. For this reason, although [the Debtor's] spouse presently has a higher income, it is reasonable to expect on average her income will bring the family income close to the amount stated as regular income from business.

23. The amended Schedule J lists the Debtor's household expenses as $5,581.82, resulting in a monthly net income of $752.92.

24. The amended Schedule J revises the Debtor's monthly mortgage payment from $998 to $922; the Debtor's monthly real estate taxes from $223.41 to $239.41; the Debtor's monthly electricity, heat, and natural gas utility expenses from $616.20 to $293; and the Debtor's monthly "other" expenses from $750 to $356.

25. The amended Schedule J also revises the Debtor's monthly home maintenance, repair, and upkeep expenses from $0 to $237.

26. The amended Schedule J includes a continuation sheet breaking out the $356 "other" monthly expenses as comprised of $50 for pet food and $306 for monthly payments on Debtor's spouse's unsecured debts.

27. On the line item of amended Schedule J which asks whether the Debtor expects an increase or decrease in his expenses within the year after he files this form, the Debtor checked the box labeled "Yes."

28. The Debtor attached an explanation of this response on the amended Schedule J which read:

The budget includes household income and expenses for [the] Debtor and spouse. The budget included [the Debtor's] spouse's payment for [an] auto loan on which [the] Debtor is not contractually obligated.

> In July, 2015, [the Debtor's] spouse's student loans will come due at a cost of $435 per month and available household income will be reduced. The plan will be reduced by $435 in the July 2015 month of the plan to $318 per month. As this amount was not due from October to February, and was thought to be $400 per month, [the Debtor] proposes extending the plan by 7 months at the rate of $318 per month. Total length of the plan will now be 46 months.
>
> Debtor expects to have [a] health insurance expense of $756.80 per month but it is not certain when that expense will begin. It is expected Debtor will be able to afford this for the foreseeable future based on possible tax refunds or credits until [the Debtor's] spouse transitions to a new job. It is expected that certain child medical needs will be incurred beginning in October and the cost may be as much as $300 for twenty months. This amount may be covered as part of [the Debtor's] spouse's unsecured debt as some of that debt is retired.

29. On January 21, 2015, the Debtor also filed an amended Chapter 13 plan.

30. The amended Chapter 13 plan calls for total payments to the Chapter 13 Trustee of $16,643.52, representing four payments of $278.97 under the original plan, five payments of $752.92, and thirty-seven payments of $317.92.

31. The amended Chapter 13 plan anticipates payments to general unsecured creditors totaling $12,479.24 for a dividend of 18.59% – almost twice the dividend the original plan would have paid.

32. On January 27, 2015, the Debtor filed an amended "Means Test" Form 22C which still indicated the Debtor's disposable income was not determined according to § 1325(b)(3).

33. On February 10, 2015, the Debtor filed amended Schedules B and C to list – and claim as fully exempt – an unliquidated refund for pool purchase in the amount of $1,039.72.

34. On February 24, 2015, the Debtor filed a second amended "Means Test" Form 22C which still indicated the Debtor's disposable income was not determined according to § 1325(b)(3).

## ISSUES PRESENTED

The legal issues before the Court revolve around two questions: whether the Debtor filed his Chapter 13 case and plan in good faith, which includes a determination of whether the Debtor has intentionally omitted or misstated material information in his bankruptcy petition and schedules, for the purpose of denying creditors the dividend they are entitled to receive in this Chapter 13 case; and whether the Debtor's plan is feasible. The Court must answer these questions in order to adjudicate Rentrak's motion to dismiss this Chapter 13 case, Rentrak's objections to confirmation of the Debtor's Chapter 13 plan, and the Debtor and Trustee's request that the Court confirm the Debtor's amended Chapter 13 plan.

## DISCUSSION

### 1. RENTRAK'S BAD FAITH ARGUMENTS

Rentrak seeks both dismissal of this case and denial of plan confirmation based on the Debtor's alleged bad faith or lack of good faith.[7] Because, as Rentrak acknowledges, see doc. # 26, n. 1, its grounds for dismissal and denial of confirmation are virtually identical, the Court will address them jointly.

Rentrak seeks dismissal of this case "for cause" pursuant to § 1307(c), which provides:

> (c) Except as provided in subsection (e) of this section, on request of a party in interest or the United States trustee and after notice and a hearing, the court may convert a case under this chapter to a case under chapter 7 of this title, or may dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause, including [examples of cause]...

Bad faith is not among the examples of "cause" listed in § 1307(c), however,

> the list set forth in § 1307(c) is not exhaustive; it merely illustrates circumstances which would constitute cause. While lack of good faith is not one of the enumerated causes, courts have held that the lack of good faith in filing a chapter 13 petition is 'cause' for dismissal pursuant to Code § 1307(c).

In re Edwards, 2003 Bankr. LEXIS 2023 (Bankr. D. Vt. Aug. 26, 2003) (citations and quotations omitted) (collecting authority). "Through § 1307 (c) ... Congress provided bankruptcy courts with a mechanism to examine and question a debtor's motives when a chapter 13 petition appears to be tainted with a questionable purpose and permitt[ed] a court to dismiss a case for 'cause.'" Id.

An assessment of bad faith takes into account the totality of the circumstances. Suggitt v. French (In re French), 2003 Bankr. LEXIS 908 (Bankr. D. Vt. May 29, 2003). The bad faith inquiry is one covering many factors and the interactions among them. In re Edwards 2003 Bankr. LEXIS 2023 at *13. Ultimately, a § 1307(c) good faith analysis must determine whether the filing is fundamentally fair to creditors and, more generally, whether the filing is fundamentally fair in a manner that complies with the spirit of the Bankruptcy Code's provisions. Id.

If a creditor succeeds in proving that a debtor filed his or her case in bad faith, then the case must be dismissed. Id. No other outcome will suffice. Id. The integrity of the system is at risk if any Chapter 13 case is allowed to proceed after a showing of bad faith. Id. However, dismissal of a case is a harsh remedy that should be applied only in situations where the creditor has demonstrated actual indicia of bad faith, not merely a lack of good faith. Id.

Rentrak also objects to confirmation of the Debtor's plan pursuant to § 1325(a)(3), which expressly requires a finding of good faith:

> (a) Except as provided in subsection (b), the court shall confirm a plan if--
>
> ...

---

[7] Rentrak also objects to confirmation of the Debtor's Chapter 13 plan on the ground the plan is not feasible. The Court addresses that argument separately, below.

7

    (3) the plan has been proposed in good faith and not by any means forbidden by law.

11 U.S.C. § 1325(a)(3). Just as courts must enforce the § 1307(c) prohibition against bad faith filings based upon a broad based analysis, there is no particular formula courts rely upon to determine whether a plan satisfies the § 1325(a)(3) good faith requirement. Instead, courts must make the good faith plan determination based on the totality of the circumstances on a case-by-case basis. Suggitt v. French (In re French), 2003 Bankr. LEXIS 908 at *16. To reach a determination of good faith, a court must find honesty of intention on the part of the debtor and inquire whether the debtor has misrepresented facts in his or her plan, unfairly manipulated the Bankruptcy Code, or otherwise proposed the plan in an inequitable manner. Id. at *17.

    However, notwithstanding the similarities between the bad faith test under § 1307(c) and lack of good faith test under § 1325(a)(3), the context of the analysis and the burden of proof for each are fundamentally distinct:

> it is critical to keep these two concepts distinct because they arise in different aspects of a case and the burden of proof differs depending on which concept is at issue. A case may be dismissed if it was filed in bad faith, pursuant to § 1307(c); and, the creditor has the burden of proving its allegation of bad faith in order to effect a dismissal. By contrast, the burden of proving good faith in a chapter 13 case falls squarely upon the debtor, who must demonstrate that his or her plan was filed in good faith. This is one of the criteria that must be established as a prerequisite to a debtor's plan being confirmed, pursuant to § 1325(a)(3).

In re Edwards, 2003 Bankr. LEXIS 2023 at *13-14.

### A. Bad Faith Conduct by the Debtor

Rentrak advances three grounds for dismissal which it alleges demonstrate bad faith on the part of the Debtor. They are:

  i. the Debtor's primary, if not sole, reason for filing for Chapter 13 relief is to seek discharge of Rentrak's non-dischargeable debt through Chapter 13's "super-discharge;"

  ii. the Debtor incurred unnecessary expenses pre-petition, which diluted the bankruptcy estate and diminished the potential distribution to unsecured creditors; and

  iii. the Debtor, in order to avoid paying creditors, has misrepresented his finances to the Court and creditors by concealing income and inflating expenses.

### i. The Super-Discharge

The Debtor concedes his primary purpose in filing for relief under Chapter 13 is to discharge Rentrak's otherwise non-dischargeable debt. Since Rentrak's debt comprises 65.6% of the Debtor's unsecured claims (and 85% of his dischargeable debts, i.e., his unsecured debts minus student loan

8

obligations), this is not surprising. However, that is not dispositive. Many courts, including this one, have held that a debtor's decision to utilize the super-discharge is not <u>per se</u> indicative of bad faith:

> [T]he Court believes that a debtor who chooses to file a chapter 13 case - even when ... it may appear that the debtor is in chapter 13 only because he or she could not obtain the relief hoped for in chapter 7 - ought to be given every reasonable opportunity to propose a plan that meets the requirements of the Bankruptcy Code and make the payments called for under that plan. Congress has made clear that the use of chapter 13 ought to be encouraged and that chapter 13 cases ought to be dismissed under § 1307(c) only upon a showing of cause.

<u>Suggitt v. French (In re French)</u>, 2003 Bankr. LEXIS 908 at *13. Rentrak has not asserted, nor do the facts demonstrate, any particular ill motive, malicious intent, or other special circumstance particular to the Debtor's attempt to discharge Rentrak's debt. The Debtor wishes to do that which Chapter 13 permits him to do. This is not an unfair manipulation of the Bankruptcy Code, but rather the Debtor "[taking] advantage of a fundamental provision that Congress intentionally enacted." <u>In re Mandarino</u>, 312 B.R. 214 (Bankr. E.D.N.Y. 2002). The Debtor's use of Chapter 13 as a mechanism to discharge Rentrak's debt does not warrant a finding either that the Debtor filed his case in bad faith or failed to propose his plan in good faith and, therefore, the first prong of Rentrak's bad faith argument is without merit.

### ii. Unnecessary Expenses

The second prong of Rentrak's bad faith argument focuses on the Debtor's allegedly unreasonable pre-petition expenditures. It points to the Debtor's choice to spend a large sum of money on a family vacation, prior to filing bankruptcy, as evidence of the Debtor's bad faith. Rentrak argues that the weeklong trip the Debtor, his spouse and their four children took to Disneyworld in April of 2014, at a total cost of approximately $6,800, was an extravagant expense which diluted the bankruptcy estate. That dollar amount, Rentrak correctly points out, exceeds the distribution to unsecured creditors proposed in the Debtor's original Chapter 13 plan, and is more than half of the distribution to unsecured creditors proposed in the Debtor's amended Chapter 13 plan.

Other courts have considered a debtor's pre-petition spending on vacation expenses in the context of bad faith. As an initial matter, a debtor's pre-petition vacation is not, in and of itself, sufficient evidence for a finding of bad faith. <u>See</u> <u>In re Barnes</u>, 158 B.R. 105, 109 (Bankr. W.D. Tenn. 1993) (in evaluating bad faith under § 707(a), "the [c]ourt certainly does not quarrel with the debtors having a vacation,"). However, vacation expenses, like any other expense, must be evaluated in the context of the totality of the debtor's circumstances. Thus, where a debtor's pre-petition vacation expenses are part of a larger pattern of conduct indicating a lack of concern for unsecured creditors, profligate and reckless spending, or a deliberate attempt to incur debt in anticipation of a discharge in bankruptcy, courts have concluded that a debtor's pre-petition vacation expenses support a finding of bad faith. The instant case, however, is

9

unequivocally distinguishable from a case where, even after the debtors liquidated non-exempt assets and incurred more than $25,000 in credit card charges to construct new home, they continued to incur additional credit card debt to enjoy a $4,000 vacation, notwithstanding their consultation with an attorney and decision to file bankruptcy. See In re Fretwell, 281 B.R. 745, 752 (Bankr. M.D. Fla. 2002) (finding bad faith). Likewise, it is markedly different from a case where the debtors incurred an additional $61,000 of credit card debt in the two years preceding the filing of their petition to enable debtors to not only take a Caribbean cruise, but also to fund a lavish wedding, remodel their home, and lease three new vehicles. See In re Kamen, 231 B.R. 275, 278 (Bankr. N.D. Ohio 1999) (finding bad faith). Similarly, Mr. Ladieu's conduct does not rise to the level of irresponsible spending that was evidenced by debtors who, prior to filing a bankruptcy petition, took a vacation, purchased three new vehicles, and encumbered their home with a $15,000 second mortgage (an amount sufficient to pay all unsecured creditors in full) to build a swimming pool. See In re Barnes, 158 B.R. at 108 (finding bad faith).

      Here, the evidence establishes the Debtor made the first installment payment for the Disneyworld trip in mid-2013, at a time when the Debtor believed the family's finances supported the expenditure. The Debtor made periodic installment payments, and planned the trip strategically to minimize airfare costs. The Court finds the Debtor's testimony regarding this trip, and his description of the family circumstances at the time he was planning it, to be credible. The trustworthy evidence also establishes that the Debtor took the vacation in April 2014, approximately six months before he filed his bankruptcy petition, and before the Debtor even contemplated filing for bankruptcy. There is no evidence of reckless or profligate spending by the Debtor. In fact, the only other evidence in the record concerning pre-petition spending indicates the opposite. The Debtor convincingly testified that he contracted to purchase a pool pre-petition, and cancelled the contract two weeks later when he realized he would need to file for bankruptcy relief.

      The Debtor credibly testified that he and his spouse began saving for the Disneyworld trip in December of 2012, almost three years before he filed the instant bankruptcy case. Rentrak disputes this, asserting the evidence demonstrates the Debtor and his spouse used surplus student loan funds to pay for the trip, and had the Debtor's spouse instead returned the surplus student loan funds, she would be required to repay less money on her student loan debt during the pendency of the Chapter 13 case, which in turn would result in a greater amount of household income available to repay unsecured creditors. Rentrak did not present persuasive evidence to support this assertion. The Debtor credibly testified that his spouse used the student loan funds to defray educational and living expenses. Based on the evidence before the Court, the Court cannot find it is more probable than not that the Debtor used student loan funds to finance his trip.

10

Ultimately, the Court concludes the Debtor's single pre-petition vacation expenditure, although considerable, does not justify a finding of bad faith. There is no evidence of a pattern of conduct indicating a lack of concern for unsecured creditors, of profligate and reckless spending, or of a deliberate scheme to incur debt with the intent of discharging it through a bankruptcy filing.

### iii. Misrepresentations in the Schedules

The third prong of Rentrak's bad faith argument is its strongest. This argument centers on the Debtor's allegedly intentional misrepresentations in his schedules and statements. Rentrak asserts the Debtor originally made numerous misrepresentations as to his assets, income, and expenses, all with the intent of decreasing the amount he would be required to devote to his Chapter 13 plan – and pay to his unsecured creditors. Rentrak argues the Debtor's amendment of his schedules and plan (including a substantial increase in total plan payments) manifest that he filed his original schedules and plan with the intent to conceal income, inflate expenses, and diminish the return to unsecured creditors. Finally, Rentrak alleges that, even as amended, the Debtor's schedules still contain multiple, material, and intentional misrepresentations.

This Court considers allegations of inaccurate schedules to be very serious. The integrity and effectiveness of the bankruptcy process is founded upon the premise that debtors file complete and accurate schedules, upon which the Court, trustees, and creditors can rely. See In re Edwards 2003, Bankr. LEXIS 2023 at *23. "[The Court] considers a debtor's duty to file true and complete schedules to be of immense significance when it evaluates whether a debtor has acted in bad faith." In re Gutierrez, 528 B.R. 1, 23 (Bankr. D. Vt. 2014). "The duty of disclosure is a basic prerequisite to obtaining a discharge in any bankruptcy." Obuchowski v. Arnold (In re Arnold), 2005 Bankr. LEXIS 2167, *6 (Bankr. D. Vt., Nov. 4, 2005).   It is always the case that a "debtor has a duty to prepare schedules carefully, completely, and accurately." In re Gutierrez, 528 B.R. 1, 16 (Bankr. D. Vt. 2014) (quoting Cusano v. Klein, 264 F.3d 936, 946 (9th Cir. 2001)). Of particular import in this case, Official Form B 6I, i.e., Schedule I, instructs a debtor to

> Be as complete and accurate as possible. If two married people are filing together (Debtor 1 and Debtor 2), both are equally responsible for supplying correct information. If you are married and not filing jointly, and your spouse is living with you, include information about your spouse.[8]

A debtor also has an absolute right to amend his or her schedules. Suggit v. French (In re French), 2003 Bankr. LEXIS 908 at *8. However, "it is equally true that when a debtor files schedules that are not clear ... and are amended multiple times, a reasonable person would have cause to question whether the original schedules were merely prepared sloppily or were calculated to obfuscate the truth." Id.

---

[8] Official Form B 6J, i.e., Schedule J, instructs similarly.

11

Here, Rentrak asserts the Debtor made the following ten misrepresentations in his filings, and together they constitute bad faith and warrant denial of plan confirmation or dismissal of the case:

i. The Debtor inflated his expenses by claiming monthly utility costs of $616 per month, when the Debtor's actual monthly utility costs were $255 per month.

ii. The Debtor concealed an asset, namely, a refund of approximately $1,039.72 from the down-payment on a purchase of a pool that the Debtor subsequently cancelled.

iii. The Debtor inflated his expenses by claiming an estimated property tax expense of $223.41 per month when his actual tax expense was $200.52 per month.

iv. The Debtor understated his income by failing to disclose his post-petition potential for overtime income, which the Debtor did in fact receive post-petition.

v. The Debtor concealed, or failed to adequately account for, pre-petition payments for jury duty and $5,200 in other pre-petition income, as evidenced by various cash deposits into the Debtor's checking account.

vi. The Debtor inflated his expenses by claiming a $998 monthly mortgage payment when his actual monthly mortgage payment was $922.34.

vii. The Debtor inflated his expenses by claiming a substantial $237 expense for home maintenance, repair, and upkeep on his amended Schedule J.

viii. The Debtor understated his spouse's income on his original Schedule I by failing to disclose, or adequately account for, her employment as a substitute teacher.

ix. The Debtor continued to understate his spouse's income by failing to amend her income – thus failing to account for her changed employment and changed income from self-employment – on his amended Schedule I.

x. The Debtor indicated on Schedule J that his expenses might increase in the future due to the beginning of repayment on the Debtor's spouse's student loan obligations and the Debtor's need to procure health insurance; however, the Debtor's spouse's student loan obligations were already accounted for elsewhere in Schedule J and did not actually begin until June of 2015.

In considering each of these allegations, the Court weighs the totality of the circumstances, the credibility of the Debtor's testimony, and the documentary evidence the parties presented at trial. If proved, they would certainly make a strong case for a finding of bad faith.

The Debtor testified with obvious candor to a chaotic family life that made it very difficult for him to focus on his finances and prepare his bankruptcy petition and schedules. The Debtor and his spouse have four children, two of whom have special needs. The Debtor typically works night shifts, including weekends, as a security guard, while his spouse works days. This makes coordination and discussion between them, including as to finances, challenging. Additionally it created a significant impediment for him in his attempt to fill out the bankruptcy schedules, aggravated by the fact that the Debtor's spouse is responsible for managing most of the family's finances.  This was further underscored by the Debtor's admission he was much less familiar and sophisticated than she with respect to money matters and the

family's financial circumstances.[9] At trial, even after months of discovery and preparation, both the Debtor and Rentrak sometimes struggled to make sense of the Debtor's finances.[10]

The Court also observes that Rentrak did not call the Debtor's spouse as a witness even though the record made clear she has greater understanding of the facts underlying the Debtor's schedules and the questions around her income were the basis for Rentrak's most serious allegations.

The Debtor's counsel took responsibility for the first two alleged misrepresentations. He acknowledged that in the original schedules he erroneously included in the utility expense figure ($616) multiple types of expenses which should have been broken out in more detail or scheduled elsewhere. The Debtor corroborated this. The amended schedules reflect a utility expense of $255, and the Debtor testified credibly to the calculation of that expense, including minor errors which had been corrected, and the reduction of the overall expense to reflect a post-petition reduction in the cost of heating fuel. The Debtor's counsel also took responsibility for failing to include as an asset the $1,039.72 down-payment refund related to the Debtor's pre-petition purchase of a pool and subsequent cancellation of that purchase. He explained he did not include it in the petition because, as of the petition date, the Debtor did not believe he would be able to obtain any refund and, in fact, he did not obtain the refund until post-petition – at which point the Debtor amended his schedules to include the refund as fully exempt.[11] Neither of these alleged misstatements is properly attributed to the Debtor as an intentional misstatement and, therefore, neither weighs in favor of a finding of bad faith.

As to the third of Rentrak's allegations of bad faith, based upon the Debtor's incorrect listing of the property tax expense, the Court finds that allegation is not supported by the facts adduced at trial. The amount of the property tax obligation the Debtor listed on his schedules was not overinflated, as Rentrak asserted. Rather, the evidence presented revealed the Debtor had inadvertently understated the property taxes he owes. (The Debtor originally listed them as $223.41 and later determined they were actually $239.41.) Thus, the Court finds this argument for a finding of bad faith fails.

The Court considers next Rentrak's fourth allegation of bad faith, which is founded upon the Debtor's failure to disclose that he might earn overtime income post-petition. The Debtor credibly testified he did not disclose his potential for post-petition overtime income because, at the time he filed his petition, his understanding, based on conversations with his employer, was that he would not have the

---

[9] For example, the Debtor's lack of comprehension around the financial details was apparent when he testified his amended Chapter 13 plan did not include payments to make up for student loan expenses originally incorrectly deducted, when actually his amended Schedule I, Schedule J, and plan extend the length of the plan to do precisely that.

[10] Neither party, for instance, was able to clearly articulate the precise amount and timing of the Debtor's spouse's income, even after the Debtor was examined on this point for a considerable amount of time.

[11] Even in the absence of the Debtor's counsel's statement taking responsibility for this omission from the schedules, the Debtor's failure to disclose this potential asset does not support a finding of bad faith because the amount of the refund was fully exempt and there was no benefit to the Debtor, and no harm to the creditors, resulting from this omission.

13

opportunity to earn overtime income. The Debtor also testified the overtime income he received post-petition was essentially a fluke, and that no further overtime work was available. The Debtor's testimony on this point was clear, confident, and credible. Significantly, Rentrak offered no evidence at all on this point. In particular, Rentrak did not offer an affidavit or testimony from the Debtor's employer to rebut the Debtor's testimony about what his employer had told him about the availability of overtime or the predictability of his work week hours post-petition. At most, the evidence regarding the Debtor's potential overtime income supports a conclusion that the Debtor was under a duty to file corrective amendments or an amended plan once the Debtor actually performed and received income from the unexpected overtime, rendering his income higher than projected in his original Schedule I. The Debtor filed an amended plan on January 21, 2015, which devotes the income received from overtime to unsecured creditors. Accordingly, the Court finds the evidence regarding the overtime pay issue does not support Rentrak's position.

The evidence offered at trial as to Rentrak's fifth alleged misstatement in the schedules – i.e., the Debtor's alleged $5,200 of undisclosed income, based upon deposits into the Debtor's household bank account – was inconclusive. Rentrak did not prove the Debtor intentionally failed to disclose these deposits with an intent to conceal assets or harm creditors, nor did it prove that the deposits represented sources of income which should have been disclosed on the Debtor's Schedule I. The evidence indicated these were income anomalies, and therefore he was under no obligation to list them in his Chapter 13 budget. Hence, Rentrak's allegation of bad faith based upon these alleged omissions is without merit.

Rentrak's evidence in support of a finding of bad faith based upon the Debtor's listing of an incorrect mortgage payment, Rentrak's sixth alleged misstatement, also fell short. The Debtor's testimony explaining the error in scheduling his mortgage payment as $998, as opposed to $922, was credible and persuasive. The Debtor explained his spouse pays the mortgage and was primarily responsible for communicating with the mortgage company. The Debtor believed the monthly mortgage payment at the time of the petition were $998, as this was the amount they had most recently been paying (to cure a small pre-petition arrearage). The Debtor testified credibly he never received mortgage statements from the bank and did not receive a statement setting out the monthly payment amount of $922 until after he had filed his bankruptcy case. Based on that testimony, the Court concludes the incorrect listing for the Debtor's mortgage arose from a genuine mistake and not from bad faith or an intent to deceive.

Rentrak's seventh alleged misstatement relates to home maintenance expenses. The Debtor testified, credibly and in detail, regarding the necessity for a $237 home maintenance expense. The Debtor admitted some of the home maintenance expenses were originally and incorrectly included in the utility expense category. The Debtor's testimony detailed substantial problems with the Debtor's home, including

14

a serious and expensive water supply defect. The Court finds this testimony fails to support a finding of bad faith, and instead supports a finding that the Debtor's schedules (and subsequent amendments) were filed without adequate attention to detail and diligence.

The remaining alleged misrepresentations, take aim at the Debtor's spouse's income and expenses, are the most troubling. The Debtor concedes his original Schedule J includes an expense entry of approximately $400 for his spouse's student loan obligations which was not actually due as of the date the Debtor filed his petition. Inclusion of a phantom expense could well be persuasive evidence a debtor intends to deceive the Court and diminish the return to unsecured creditors for his own benefit. See Cadle Co. v. King (In re King), 272 B.R. 281, 302 (Bankr. N.D. Okla. 2002). However, the evidence presented at trial persuades the Court the Debtor included this expense as a result of honest error. The Debtor testified his spouse graduated in 2013, and shortly thereafter consolidated her educational loans. The Debtor stated under oath that although repayment of these loans was deferred for a brief period of time due to the family's income level, he was under the impression the student loans would become due by January 2015, at the latest. Pre-petition, the Debtor's spouse never received any statements from the lender and, despite her repeated efforts to contact the lender, she was unable to confirm when payments would begin. Based on his assumption that payments would begin no later than January 2015, and his knowledge that payments would become due in the foreseeable future, the Debtor included the student loan expense in an amount equal to his best estimate of what the monthly payment would be, and also included a statement in Schedule J indicating available income might change in the coming months due the Debtor's spouse's student loan obligations. Post-petition, the Debtor's spouse learned her student loan repayment obligation would not begin until June of 2015, at which point the Debtor amended his Schedule J. The Debtor also amended his plan to include payments to "make up" the $400 per month payments erroneously deducted in their filed budget. Taken as a whole, the evidence as to this issue demonstrates that, although the Debtor's efforts to ascertain his spouse's student loan expenses may have fallen short of the level of care the Debtor ought to have undertaken in preparing his bankruptcy schedules, and although the better practice would have been to more fully disclose the Debtor's assumptions regarding student loan obligations, the Debtor did not schedule this expense in bad faith or in an attempt to divert money from his unsecured creditors. Moreover, the Debtor's amended plan restored unsecured creditors to the dividend level they would have had if the Debtor had not made this error.

Rentrak also alleges the Debtor intentionally failed to disclose his spouse's income from substitute teaching on his original Schedule I. It is true Schedule I indicates the Debtor's spouse's only net income was $4,132 from self-employment. However, the evidence at trial did not demonstrate the Debtor's spouse had begun that employment prior to the date of the petition, nor that the Debtor was aware when his

15

spouse was going to begin that employment. Rather, the Debtor credibly testified his spouse's employment did not actually begin until post-petition, and testified that he was not aware until after his petition was filed that she would be employed at all. The Court concludes the evidence on this point does not support a finding the Debtor deliberately omitted his spouse's employment income in an attempt to divert money from unsecured creditors, but rather supports a finding the Debtor omitted his spouse's employment because it was not yet set at the time the Debtor filed his Chapter 13 petition.

The last alleged bad faith misrepresentation Rentrak identifies is grounded in the Debtor's failure to correctly disclose the amount of his spouse's income in his amended Schedule I. The Debtor listed the same amount for his spouse's self-employment income on his amended Schedule I as he had listed on the original Schedule I, and in particular listed no income from substitute teaching, notwithstanding the Debtor's knowledge that his spouse was employed as a substitute teacher post-petition and was likely to remain employed for at least the next several months, and his knowledge that his spouse's self-employment income had fluctuated since the filing of his original Schedule I. The evidence presented on this point was rather perplexing. The Debtor appeared to concede in his testimony that Schedule I did not include all of his spouse's income. The Debtor attributed these errors to two factors. First, the Debtor pointed to his spouse's self-employment and uncertain, sporadic employment as a substitute teacher, which made it complex to compute her income. Second, the Debtor explained that his spouse's transition away from self-employment toward full-time teaching made it impossible for him to project exactly what her future income would be. The Debtor testified that while his Schedule I, both as originally filed and as amended, incorrectly indicated his spouse received income only from self-employment, and erroneously failed to list income from substitute teaching, he was confident he had predicted his spouse's total net future income as precisely and accurately as he could, and that he did this in an effort to put forth a meaningful forward-looking budget, particularly in light of the fact that her income from self-employment had been decreasing over the last few months and was likely to continue to decrease. This speculative situation was compounded by the Debtor's belief that, based on his spouse's employment as a substitute teacher, there was a high likelihood she would be unemployed during the summer months, and thus her projected income needed to average her current, higher income, with the reality of her coming unemployment during, at least, the summer. In this regard, the Debtor testified if his spouse's income from teaching increased, that additional income would be offset by a corresponding decrease in her self-employment income. The Debtor's testimony on this point mirrored the lengthy addendum to the Debtor's amended Schedules I and J which disclosed, in considerable detail, the Debtor's assumptions and projection related to his spouse's income. However, in a rather disquieting explanation of why the Debtor intentionally excluded a portion of his spouse's self-employment income from Schedule I, the Debtor also

16

seemed to indicate he was under the impression he did not need to include as income on his Schedule I that portion of his spouse's current income that was earmarked to pay her self-employment tax obligations. The Debtor also testified approximately $5000 of that segregated income had in fact been used pre-petition to satisfy the Debtor's own long-delinquent tax liability, because he needed to pay these taxes as a condition to obtaining his current security guard position. He did not testify as to the amount of income withheld for future self-employment taxes, or how, if at all, the Debtor's spouse segregates those funds. Moreover, the Debtor did not specify in his schedules any income being escrowed for satisfaction of tax liability.

Accurate and honest disclosure of income is crucial to an evaluation of a debtor's good faith, and a debtor's concealing of a source of income may support a finding of bad faith. See In re Gutierrez, 528 at 24 (citing In re Zick, 931 F.2d 1124, 1129 (6th Cir. Mich. 1991)). This Court scrutinizes with great care allegations that a debtor has concealed income. Taking into account all pertinent factors, and the strength and credibility of the evidence presented here, the Court is not persuaded either that the Debtor deliberately concealed income for his own benefit or that he was motivated to keep a portion of his spouse's income off his schedules by a desire to diminish the repayment of his creditors. Although the Court is troubled by the Debtor's failure to disclose the income the Debtor's spouse set aside for payment of withholding taxes, especially since Debtor could have easily addressed this tax obligation by properly completing Schedule J or attaching an addendum, the Court finds the Debtor's testimony to be credible and plausible, particularly in light of the lack of any tax withholding reflected in the itemization of the Debtor's spouse's self-employment income and the Debtor's apparent lack of financial expertise. Likewise, the Court finds the Debtor's other explanation of the errors concerning the Debtor's spouse's income to be credible and plausible.[12] However, notwithstanding the Debtor's good faith efforts to be complete and truthful, in light of the Debtor's incomplete disclosures in the past and the fact that the Debtor's family's income is in flux, it is crucial to put a mechanism in place to verify the Debtor's family income going forward. Therefore, so long as the Debtor's spouse continues to be self-employed (whether it is full-time or part-time), the Court will require the Debtor to file monthly statements itemizing the Debtor's spouse's income, broken down by source, with a statement of expenses from self-employment, including any amount of income that has been segregated for the purpose of paying self-employment (or other) taxes, as well as a disclosure of any overtime pay the Debtor has earned during the reporting period.

---

[12] The Court also observes that the Debtor's counsel took responsibility for some of the issues on the amended Schedules I and J, including the Debtor's failure to amend his spouse's income and include her income from substitute teaching. Counsel stated that he believed the lengthy addendums attached were sufficient and therefore did not, as would have been better practice, amend the spouse's income and include an addendum.

17

Rentrak also seeks a finding of bad faith based upon the Debtor's multiple amendments of his schedules, with emphasis on the fact that the Debtor filed curative amendments to the schedules and plan almost exclusively in response to Rentrak's objections. This raises the legitimate question of whether the Debtor would have amended his schedules to set forth accurate disclosure of income and expenses, or increased the dividend to unsecured creditors, if Rentrak had not filed its objections. Where the Debtor has been less than satisfactorily diligent, as is the case here, this is an important and a potentially determinative inquiry.

This too, however, is subject to a balancing test. The Court will not treat amendments to schedules and plans as an admission of wrongdoing where the Court is convinced the amendments were made to correct genuine mistakes, rather than as an "after the fact" correction designed to exculpate the Debtor for abuse of the system. Here, the procedural history of the amendments does not reflect excessive amendments or a concerted effort to deceive the Court or creditors. When a debtor becomes aware of an error in his or her schedules or plan, he or she must be able to amend. If the Court were to grant relief based upon this argument, in the absence of any showing of intent to deceive, it would place honest debtors in the untenable position of being unable to file corrective amendments for fear of those amendments being used as a admission of bad faith. That is unsound policy and contrary to the practice this Court encourages, which is an ongoing and careful scrutiny of schedules and prompt amendment whenever a debtor discovers an error or oversight.

The Debtor testified persuasively that he "did his best," and although he may have made some mistakes, Rentrak has failed to prove any bad faith. Based on the Debtor's testimony, the Court finds any misrepresentations the Debtor made were inadvertent, and without an intention to mislead the Court or deprive creditors their due. Although the Debtor's best effort failed to produce flawlessly accurate schedules, the Court finds the evidence as a whole does not support a finding of bad faith. Accordingly, Rentrak's motion to dismiss for bad faith is denied.

The Court also finds the evidence supports a conclusion that the Debtor's Chapter 13 plan, as amended, is proposed in good faith. The plan devotes all of the Debtor's disposable income to repayment of creditors. That satisfies the Debtor's obligations under the Bankruptcy Code. See 11 U.S.C. §§ 1325(a)(4) and (b). In fact, as the Chapter 13 Trustee points out, the Debtor's plan exceeds the payment obligations imposed by the Code. Although the Debtor is required to devote all of his disposable income to the plan for a period of thirty-six months, the Debtor's plan proposes to extend that time period by an additional ten months, for a total of forty-six months. Additionally, the Debtor credibly testified he understood the need for his plan to be fair to all parties involved, and taken as a whole, the Debtor's testimony indicated that he believed his schedules now fully and accurately disclose his assets, income,

expenses, and debts. After comprehensively assessing the totality of the circumstances, the record, and the evidence offered at trial, the Court concludes the Debtor's plan, as amended, does not misrepresent facts nor include provisions aimed at manipulating the Bankruptcy Code, and is proposed in good faith. Accordingly, Rentrak's objection to confirmation for lack of good faith is overruled.

### 2. RENTRAK'S LACK OF FEASIBILITY ARGUMENT

Rentrak also objects to confirmation of the Debtor's proposed Chapter 13 plan on the basis that the plan is not feasible.[13] To confirm a Chapter 13 plan, a Court must determine that "the debtor will be able to make all payments under the plan and to comply with the plan." 11 U.S.C. § 1325(a)(6). "[A] court may not approve a plan unless, after considering all creditor's objections and receiving the advice of the trustee, the judge is persuaded that the debtor will be able to make all payments under the plan and to comply with the plan." Till v. SCS Credit Corp., 541 U.S. 465, 480 (U.S. 2004) (internal quotations and citations omitted). To demonstrate that their proposed plan is feasible, Chapter 13 debtors must show that their plan has a reasonable chance of success. Mycek v. Danielson (In re Mycek), 2013 U.S. Dist. LEXIS 189203 (C.D. Cal. Oct. 22, 2013). When a plan is to be funded by future income from employment, a Chapter 13 debtor meets his/her burden of demonstrating the viability of a Chapter 13 plan by showing a stable employment history, present employment, and a current income level sufficient to make proposed plan payments. In re Soppick, 516 B.R. 733, 749 (Bankr. E.D. Pa. 2014). However, "a debtor proposing a Chapter 13 plan need not prove that the plan is guaranteed to be successful. Virtually every plan that requires some performance in the future will be subject to a risk factor affecting its successful completion." In re Anderson, 18 B.R. 763, 765 (Bankr. S.D. Ohio 1982); see In re French, 2005 Bankr. LEXIS 373 (Bankr. D. Vt. Mar. 4, 2005).

Rentrak's feasibility objection focuses, in large measure, on potential future complications in the Debtor's family income and ability to fulfill the promises made in the plan. Particularly, Rentrak questions whether the Debtor will be able to satisfy post-petition tax obligations arising out of his spouse's self-employment, and whether he will be able to satisfy his plan payments in light of the increases he projects in several categories of expense, including health care, medical insurance, childcare, and his spouse's student loans. Rentrak also calls the Court's attention to potential fluctuations in the Debtor's spouse's future income, given her intention to decrease the time she devotes to her self-employment venture and increase the time she devotes to her less lucrative teaching career. The key word in both arguments, however, is potential. Rentrak advances no arguments – and presented no evidence at trial to show – that

---

[13] This argument is a bit difficult to harmonize with Rentrak's bad faith argument: in this aspect of Rentrak's objection, the creditor posits the Debtor does not have adequate income to fund the amended plan, whereas in its bad faith argument Rentrak argues the Debtor actually has more money than the record would suggest. Notwithstanding that somewhat remarkable contrast, the Court will address the feasibility objection Rentrak has put forward, on its merits.

the Debtor's plan is not feasible at this time. As of now, the Debtor's plan is feasible. It proposes payments that are within the Debtor's current budget and the budget the Debtor reasonably foresees going forward. The Debtor's ability to make the plan payments is not dependent on some speculative future event (such as a sale), but rather is based on actual income the Debtor and his spouse currently earn and the Debtor has reason to expect they will continue to earn during the term of the plan. That is sufficient for this Court to conclude the plan as proposed is feasible. The Court does not have a crystal ball it can consult to predict whether the Debtor's income and expenses will remain stable and sufficient for the term of the plan. The mere possibility the Debtor and his family may suffer some future financial calamity which could interfere with his ability to meet his monthly expenses is nothing more than many people face – both inside and out of bankruptcy. It is not sufficient to justify a finding the plan is not feasible.

## **CONCLUSION**

For the reasons set forth above, the Court finds the Debtor has met his burden of proof to show he filed his Chapter 13 case and plan in good faith, and also finds the Creditor has not met its burden of proof to establish the Debtor has acted in bad faith in connection with the filing of this case or plan, that the amended Chapter 13 plan is not feasible, or there is cause to dismiss the case. Accordingly, the Court overrules all of Rentrak's objections to confirmation of the Debtor's amended Chapter 13 plan, denies Rentrak's motion to dismiss the Debtor's Chapter 13 case, and finds the Debtor has met all of the legal and procedural prerequisites for confirmation of his amended Chapter 13 Plan.

This constitutes the Court's findings of fact and conclusions of law.

_____

June 1, 2015  
Burlington, Vermont

Colleen A. Brown  
United States Bankruptcy Judge